IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 19, 2015 Session

**TERRY LYNN KING v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 101842      Mary Beth Leibowitz, Judge**

---

**No. E2014-01202-CCA-R3-ECN - Filed May 28, 2015**

---

The Petitioner, Terry Lynn King, appeals the Knox County Criminal Court's denial of his petition for a writ of error coram nobis regarding his convictions for felony murder, for which he was sentenced to death, and for armed robbery, for which he is serving 125 years. The coram nobis court dismissed the petition because it was untimely and because due process did not require tolling the one-year statute of limitations. On appeal, the Petitioner contends that the court erred by dismissing the petition. We affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Stephen Ross Johnson (on appeal and at hearing), Ashlee Brooke Mathis and Richard C. Stooksbury III (on appeal), Student Attorneys of the University of Tennessee College of Law Innocence and Wrongful Convictions Clinic, and Wade V. Davies (at hearing), Knoxville, Tennessee, for the appellant, Terry Lynn King.

Herbert H. Slatery III, Attorney General and Reporter; Andree S. Blumstein, Solicitor General; John H. Bledsoe, Senior Counsel; Randall E. Nichols, District Attorney General; and Deshea Dulaney Faughn, Assistant District Attorney General by appointment, for the appellee, State of Tennessee.

**OPINION**

This case relates to the 1983 killing of Diana K. Smith. The Tennessee Supreme Court summarized the facts of the case in the appeal of the Petitioner's convictions:

Mrs. Smith left her home on Sunday afternoon, July 31, 1983, to go to a nearby McDonald's to get food for her family. Her automobile, a 1979 Camaro, was found on August 4, 1983, off the road in a heavily wooded area near Blaine, Tennessee.

On August 6, 1983, Mrs. Donna Allen went to the Asbury quarry in Knox County to swim. She noticed a strange odor coming from a yellow tarpaulin in the water near the bank, and reported the circumstance to the sheriff's office. On following-up Mrs. Allen's report, officers found the body of a white female in an advanced state of decomposition. The body was later identified as being that of Mrs. Smith. Death was from one or more shots fired into the back of Mrs. Smith's head from a high-powered weapon.

In the course of the police investigation, the attention of the officers was focused on Terry King and Randall Sexton when Jerry Childers, an acquaintance of King, reported a conversation he had had with King and what he had found when he followed up on the conversation.

Jerry Childers testified that Terry King came to his house on the afternoon of Monday, August 1, 1983, and inquired as to whether Childers knew anyone that wanted to buy parts from a 1979 Camaro. According to Childers, King told Childers he had killed the woman who owned the automobile after she threatened to charge defendant with rape. According to Childers, defendant said he made the woman get out of the car trunk where he had confined her and lie face down on the ground, that the woman faced the defendant and begged him not to shoot her and offered money, and that he ordered her to turn her head away from him. When she did, he shot her in the back of the head. Defendant also told Childers he took forty dollars from the woman as well as taking her automobile.

The following Friday, which was August 5, 1983, Childers related defendant's story to Mr. Buford Watson. On Sunday, Childers went to the location defendant had described as the place of the killing and found something with hair on it. Childers then gave the information he had to Detective Herman Johnson of the Knox County Sheriff's Department and T.B.I. agent, David Davenport. In following up the report, the officers met Childers near Richland Creek and searched the area, finding pieces of bone, hair, and bloodstains. A later more thorough search turned up bullet fragments and additional bone fragments.

In the course of the police investigation, defendant and co-defendant, Sexton, were interviewed by the officers. Both gave written statements detailing the events of the night of July 31, 1983. Neither defendant testified in the guilt phase of the trial, but their statements were introduced in evidence. Both defendants testified in the sentencing phase of the trial and repeated in substance the facts set forth in the statements given the police officers in their statements.

The statements of King and Sexton were markedly similar for the time the two men were together. King's statement was the more comprehensive since it covered the entire period of time he was with Mrs. Smith. According to defendant, he and his cousin, Don King, picked up Mrs. Smith at the Cherokee Dam on Sunday, July 31, 1983. Defendant drove Mrs. Smith in her automobile to the nearby house trailer of his cousin, arriving there around 7:00 p.m. Don King drove his own automobile to the trailer. Shortly after arriving at the trailer, defendant called Eugene Thornhill who came to the trailer and left with defendant to obtain LSD and quaaludes. Defendant said he and Mrs. Smith took the drugs. Thereafter, defendant, Don King, and Eugene Thornhill had sex with Mrs. Smith.

After staying at the trailer for several hours, defendant and Mrs. Smith left in her automobile, with defendant driving. They went to a wooded area, where they again had sex. From there, they went to a service station for gas. Mrs. Smith got out of the automobile and grabbed the keys. Defendant told her to get back in the automobile and she did so. The defendant drove Mrs. Smith back to the wooded area, where they again had sex and the defendant took forty dollars from Mrs. Smith. According to defendant, Mrs. Smith then asked "why did you all rape me?" Defendant stated that he knew then what he was going to do. He told Mrs. Smith to get into the trunk of the automobile. When she did, defendant drove to Sexton's house and told Sexton he had a woman in the trunk of the automobile and needed Sexton's help. Defendant got a rifle from Sexton and also a shovel. Defendant and Sexton then left the Sexton home in separate automobiles. After making a stop at a Publix station to purchase gas, defendant and Sexton drove to a wooded area near Richland Creek in Knox County. Defendant drove the 1979 Camaro off the road and became stuck. He then made Mrs. Smith get out of the automobile trunk and pointed the loaded rifle at her. Defendant made Mrs. Smith lie down on the ground, assuring her that he was not going to kill her, that others were coming to have sex with her. Sexton left in his automobile to return a funnel to the gas station. While he was gone, defendant shot Mrs. Smith in the back of the

head. On Sexton's return, and after getting the Camaro unstuck, the two went through Mrs. Smith's effects, burning her identification. They then attempted to bury the body, but gave up because of the hardness of the ground. The next morning, defendant and Sexton wrapped Mrs. Smith's body in a tent, weighted it with cinder blocks and dumped it in the Asburn quarry. Mrs. Smith's automobile was hidden near Sexton's house.

Agent Davenport testified that after making his statement, the defendant took him and other officers to the place where the Camaro was hidden and defendant also showed them where he had hidden the automobile license plate in a hollow tree. The defendant also showed the officers where he had placed the body in the quarry and where the shooting occurred.

Tommy Heflin, a firearms examiner for the Tennessee Bureau of Investigation [(TBI)], testified that he had examined the .30 Marlin rifle belonging to Sexton, the metal bullet jacket, and fragments recovered from the scene of the killing. According to Mr. Heflin, the intact metal jacket had been fired from Sexton's rifle and the fragments were fired from a rifle with the same rifling characteristics as Sexton's rifle. Mr. Heflin was of the opinion that at least two bullets had been fired.

Dr. Joseph Parker, who performed an autopsy on the body of Mrs. Smith, testified that death was due to an extensive head injury consistent with gunshot wounds from a high-powered rifle.

Over objection, the State also presented evidence through Lori Eastman Carter that defendant had attempted to kill her on October 13, 1982. According to Mrs. Carter, King hit her with a slapstick numerous times, while repeatedly asking her "how it felt to be dying, so that the next woman he killed he would know how she felt." Mrs. Carter testified that she lost consciousness. When she came to, she was still in her automobile with her hair rolled up in the window. She further testified that she heard defendant tell his cousin that he had killed her and wanted James King to help him put her in a quarry and burn her automobile.

James King disputed Mrs. Carter's version of events, saying that defendant came to King's home to get him to follow defendant to St. Mary's Hospital as Mrs. Carter was ill and needed treatment.

-4-

Karen Greeg, Lori Carter's sister, testified that Mrs. Carter [cannot] be believed, even under oath.

*State v. King*, 718 S.W.2d 241, 243-45 (Tenn. 1986). The Petitioner sought post-conviction relief on multiple grounds, including the ineffective assistance of counsel. The post-conviction court denied relief, and this court and the supreme court affirmed. *See King v. State*, 989 S.W.2d 319 (Tenn. 1999).

The Petitioner also sought habeas corpus relief in the United States District Court for the Eastern District of Tennessee. *See Terry Lynn King v. Ricky Bell, Warden*, No. 3:99-cv-454, 2011 WL 3566843 (E.D. Tenn. Aug. 12, 2011) (order). The relevant issue raised in his habeas corpus petition surrounded an allegation that the State "withheld exculpatory, mitigating, and/or impeachment evidence" in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Id*. at *32. During the federal habeas corpus proceedings, subpoenas duces tecum were issued, and as a result, in 2000, the Petitioner's counsel discovered certain evidence possessed by the State at the time of the trial but unknown to the Petitioner's trial and post-conviction counsel. Consequently, the Petitioner asserted that the State withheld evidence showing that only one gunshot was "associated with . . . [the] murder." *Id*. at *33. He alleged that "records recently obtained . . . from the TBI reveal[ed] that only one bullet was found at the crime scene and that Ms. Smith was shot one time." *Id*. The district court stated that it "appear[ed] from the record that there was some confusion as to whether the bullet fragment was recovered from the site where . . . Millard's[1] body was found or where Ms. Smith was killed." *Id*. The Petitioner argued the confusion stemmed from finding one metal object where Ms. Smith was killed and two at Mr. Millard's grave site, which were submitted to the TBI for analysis. *Id*. The court concluded that the Petitioner failed to show the State withheld evidence or deliberately presented false evidence and that because overwhelming evidence existed of the Petitioner's guilt, including his confession, any alleged violation was immaterial. *Id*. at *34. The Petitioner also alleged that relative to Ms. Carter, the State withheld photographs and hospital records that would have impeached her testimony regarding the Petitioner's beating her until she was unconscious. The court, though, concluded that the Petitioner had not established a *Brady* violation because the evidence nonetheless showed Ms. Carter was assaulted and received medical treatment for her injuries. *Id*. at *34-35.

After the district court denied habeas corpus relief, the Petitioner filed a motion to alter or amend the district court's memorandum and judgment order, in relevant part, with

---

[1] The Petitioner was also convicted of the first degree murder and aggravated kidnapping of Todd Lee Millard after law enforcement questioned the Petitioner regarding Ms. Smith's death.

respect to the *Brady* claims, and he also filed a motion for status. The court denied the motions after finding that they were attempts to "re-argue the points previously considered." *Terry Lynn King v. Ricky Bell, Warden*, No. 3:99-cv-454 (E.D. Tenn. Sept. 25, 2013) (memorandum and order). The record reflects that although the court declined to certify any of the Petitioner's claims for review by the Sixth Circuit Court of Appeals, an October 28, 2014 order shows that the appellate court granted a certificate of appealability relative to his ineffective assistance of counsel allegations. *See Terry Lynn King v. Wayne Carpenter, Warden*, No. 13-6387 (6th Cir. Oct. 28, 2014) (order). The Petitioner's appeal is currently pending before the Sixth Circuit Court of Appeals.

On June 25, 2013, the Petitioner filed the present petition for a writ of error coram nobis relying on the evidence discovered in 2000 during the federal habeas corpus proceedings. He stated in his petition that the State relied on two theories of the case at the trial: (1) the Petitioner subjected Ms. Smith to cruelty by shooting her multiple times in the head and (2) the Petitioner severely assaulted Ms. Carter and made statements to Ms. Carter explaining Ms. Smith's murder. He argued that newly discovered TBI reports showed the victim was shot only once and that newly discovered medical records and photographs showed Ms. Carter did not have the extensive injuries she described at the trial. Further, he argued that without the TBI reports, the prosecution deprived him of the opportunity to support his intoxication defense and to rebut the prosecution's theory of the case. Relative to the medical reports and photographs, he claimed he was deprived of the opportunity to cross-examine and effectively impeach Ms. Carter's critical testimony.

On September 16, 2013, the Petitioner filed a request for discovery, inspection, and notice of intent to use evidence. The State responded on September 23, by filing a motion to dismiss the petition as untimely pursuant to Tennessee Code Annotated section 27-7-103, noting that the relevant evidence was obtained in 2000 and that the petition was filed in 2013. The Petitioner opposed the motion and claimed due process required tolling the statute of limitations. He later filed a motion to compel discovery.

At the May 14, 2014 motion hearing, the coram nobis court heard argument from defense counsel and the State. Counsel stated that the federal habeas corpus proceedings in 2000 permitted limited discovery. Counsel received records that were never disclosed to trial or post-conviction counsel. Affidavits from trial and post-conviction counsel reflecting the State's failure to provide these records were submitted to the court. Counsel stated that he was told the records were considered confidential and not provided before the trial for policy reasons. He requested additional discovery pursuant to Tennessee Criminal Procedure Rule 16 but suggested issuing subpoenas for the "law enforcement and other files in this case," placing the files under seal, and permitting the court to perform an in camera review.

Relative to the TBI reports showing that the victim was only shot once, defense counsel argued that the information was material to the defense because the State presented proof that the Petitioner shot the victim more than once to establish the culpable mental states for the offenses and to negate his intoxication defense. Relative to the medical reports and photographs of Ms. Carter, counsel argued that the information was material because Ms. Carter's testimony was used to show the Defendant possessed the required mental states for the offenses and the reason for the killing. Counsel argued the information was critical to Ms. Carter's cross-examination and to supporting the intoxication defense.

Relative to the State's motion to dismiss for the untimeliness of the petition, defense counsel did not dispute that the statute of limitations had expired and that the relevant evidence was discovered in 2000 during the federal habeas corpus proceedings. Counsel argued that the Petitioner was entitled to due process tolling of the statute of limitations because the State did not "have clean hands." He argued that the relevant information was not provided during the trial and post-conviction proceedings, although the State possessed the information before the trial. Counsel said that after the TBI reports, the medical records, and the photographs were discovered in 2000, the federal district court did not enter an order resolving the habeas corpus petition for an additional twelve years. Upon entry of the district court's ruling, the Petitioner filed a motion to alter or amend, and the district court entered its order denying the motion in 2013. Counsel noted the matter was pending before the Sixth Circuit Court of Appeals.

The coram nobis court found that the judgments became final in 1985 but that the petition for a writ of error coram nobis was not filed until June 26, 2013, twenty-eight years after the judgments became final, thirteen years after the discovery of the evidence during the federal habeas corpus proceedings, and almost two years after the federal district court denied relief. The court found that the Petitioner took no action in the Tennessee courts when he discovered the information during the federal proceedings. The court noted the Petitioner had possessed the TBI reports, medical records, and photographs for approximately eleven years at the time the district court denied relief. The court found that "the time within which the petition was filed exceeds the reasonable opportunity afforded by due process." The court explained that the thirteen-year delay from the discovery of the evidence and the twenty-two month delay after the district court denied relief were encompassed in its finding that due process did not warrant tolling the statute of limitations.

On appeal, the Petitioner contends that the coram nobis court erred by summarily dismissing his petition because due process requires tolling the statute of limitations. The State responds that the court properly dismissed the petition. We agree with the State.

A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were not litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." T.C.A. § 40-26-105(b) (2012); *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995); *see Cole v. State*, 589 S.W.2d 941 (Tenn. Crim. App. 1979). The purpose of a coram nobis proceeding "is to bring to the attention of the court some fact unknown to the court, which if known would have resulted in a different judgment." *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1966). The decision to grant or deny such a writ rests within the sound discretion of the court. *Jones v. State*, 519 S.W.2d 398, 400 (Tenn. Crim. App. 1974); *see Teague v. State*, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988). A petition for a writ of coram nobis must be filed within one year of the judgment becoming final in the trial court. *State v. Mixon*, 983 S.W.2d 661, 670 (Tenn. 1999). A judgment becomes final "thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." *Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010). A limited exception to the statute of limitations exists when due process requires tolling. *Workman v. State*, 41 S.W.3d 100, 103 (Tenn. 2001).

"When a petitioner seeks a writ of error coram nobis based on newly discovered evidence of actual innocence, due process considerations may require tolling of the statute of limitations." *Harris*, 301 S.W.3d at 145 (citing *Workman*, 41 S.W.3d at 101). "[B]efore a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." *Burford v. State*, 845 S.W.2d 204, 208 (Tenn. 1992); *see Workman*, 41 S.W.3d at 102. However, a petitioner "must exercise due diligence in presenting the claim." *Harris*, 301 S.W.3d at 144. Whether due process principles require tolling the statute of limitations is a mixed question of law and fact and is reviewed de novo with no presumption of correctness. *See Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006).

The parties do not dispute that the coram nobis petition was filed long after the statute of limitations expired, and we conclude that the petition was untimely because it was filed nearly twenty-eight years after the judgments became final. Relative to due process tolling, the Tennessee Supreme Court has prescribed a three-part analysis whereby the coram nobis court must

> (1) determine when the limitations period would normally have begun to run;
> (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable

opportunity to present the claim. In making this final determination, courts should carefully weigh the petitioner's liberty interest in "collaterally attacking constitutional violations occurring during the conviction process," *Burford*, 845 S.W.2d at 207, against the State's interest in preventing the litigation of "stale and fraudulent claims." *Id.* at 208.

*Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995) (footnote omitted).

The record reflects that the evidence was discovered in 2000 during the federal habeas corpus proceedings and that the evidence was never provided to trial and post-conviction counsel. The relevant evidence was clearly discovered by the Petitioner after the trial, although the parties do not dispute the evidence was in the prosecution's possession at the time of the trial. Therefore, our inquiry is limited to whether the delay in filing the coram nobis petition was reasonable.

The Petitioner asserted at oral argument that it was not unreasonable to file the coram nobis petition after the district court resolved the federal habeas corpus petition because of the then-status of the law. The State conceded at oral argument that the Petitioner might have been entitled to tolling of the limitations period until 2001 when the procedure governing coram nobis petitions was clarified by our supreme court in *Workman* and subsequent cases. The State further argued any lingering uncertainty after *Workman* was eliminated by *Freshwater v. State*, 160 S.W.3d 548 (Tenn. Crim. App. 2004). The State asserted that the twelve-year delay after *Workman* and the nine-year delay after *Freshwater* prevents due process tolling of the statute of limitations.

In *Workman*, the petitioner filed a petition for a writ of error coram nobis after discovering evidence related to whether the petitioner fired the fatal shot killing a Memphis police officer. The relevant evidence was obtained from the Shelby County Medical Examiner's Office years after the conclusion of the post-conviction proceedings, and the delay in obtaining the evidence was not attributable to the petitioner or his counsel. The coram nobis petition was filed thirteen months after discovery of the new evidence. Our supreme court concluded that the thirteen-month delay did not preclude tolling the statute of limitations in which to file the petition because a petitioner must "be afforded a 'reasonable opportunity after the expiration of the limitations period to present his claim in a meaningful time and manner.'" *Workman*, 41 S.W.3d at 103 (quoting *Williams v. State*, 44 S.W.3d 464, 471 (Tenn. 2001)). The court concluded that the petitioner's interest in an evaluation of the newly discovered evidence that might show actual innocence of capital murder outweighed the values justifying the statute of limitations. *Id*. at 103-04.

In *Freshwater*, the petitioner was convicted of first degree murder in 1969 and sentenced to ninety-nine years' confinement. The petitioner's trial counsel sought discovery-related material concerning written statements of any "informer" from a Mississippi jail who had contact with the petitioner and her codefendant. Upon the request, only portions of the relevant witness's statement were provided to counsel. Omitted from discovery was the witness's statement that the codefendant confessed to being the only shooter. In September 2002, the omitted portion of the statement was discovered and formed the basis of the petitioner's petition for coram nobis relief, which was filed on February 6, 2003, alleging the State's failure to provide the omitted portion of the statement violated *Brady v. Maryland*. Although the State argued an alleged *Brady* violation was inappropriate for coram nobis relief, this court noted that coram nobis relief is proper "for matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on a writ of error, or in a habeas corpus proceeding." *Freshwater*, 160 S.W.3d at 555 (internal quotation marks and citation omitted). This court concluded that the *Brady* violation alleged by the petitioner was not an issue that could have been raised and litigated previously because the evidence was not discovered until 2002. *Id*. at 556.

In considering whether due process warranted tolling the limitations period in *Freshwater*, this court noted that determining what constitutes a reasonable opportunity to present a claim in a coram nobis petition required an evaluation of "'the governmental interests involved and the private interests affected by the official action[.]'" *Id*. at 556-57 (quoting *Workman*, 41 S.W.3d at 102). This court noted that similar to *Workman*, the petitioner "raised serious questions" relative to whether she murdered the victim and that the alleged exculpatory evidence was withheld by the State after a specific discovery request. *Id*. at 557. This court noted that "'[t]he State's finality interest is seriously compromised when the prosecution has suppressed evidence in violation of its constitutional duty and is directly responsible for causing the delay in finality.'" *Id*. at 558 (quoting *Harris v. State*, 102 S.W.3d 587, 602 (Tenn. 2003) (Anderson, J., dissenting) (citing *Sample v. State*, 82 S.W.3d 267, 276 (Tenn. 2002)). As a result, this court concluded that due process required tolling the statute of limitations and that the petitioner was entitled to an evidentiary hearing. *Id*.

Although the status of the law was unclear relative to whether a *Brady* violation could serve as a basis for a coram nobis petition before *Workman* and *Freshwater*, these cases established that a coram nobis petition is the proper cause of action in which to raise *Brady* violations relative to newly discovered exculpatory evidence possessed by the prosecution at the time of a trial but never disclosed to the defense. Therefore, by 2004, and arguably as early as 2001, the Petitioner was on notice that he needed to file his coram nobis petition in state court relative to the evidence discovered in the federal proceedings. The Petitioner's explanation for failing to file the coram nobis petition was fear of creating procedural

roadblocks in the federal habeas corpus proceedings and losing his right to present the *Brady* violation before the district court. Even if his fear was warranted at the time the evidence was discovered in 2000, our supreme court released *Harris*, which addressed this issue, in January 2010, almost three and one-half years before the Petitioner filed his present petition.

In *Harris*, the petitioner was convicted of first degree murder in 1988 and sentenced to life imprisonment. In 1992, he unsuccessfully sought post-conviction relief, in relevant part, on the basis that the State withheld exculpatory evidence. On December 10, 1998, he sought to reopen his post-conviction proceedings because the prosecution failed to disclose the identity of an alibi witness. The petitioner learned of the witness when he received an anonymous letter in response to an August 1998 newspaper advertisement that sought information about his case. According to the letter, the witness told an unknown police officer that a man resembling the petitioner assisted her when she had car trouble on September 8, 1987. The witness told the officer that she saw nothing suspicious inside the man's vehicle. These events occurred at the same time the petitioner allegedly killed the victim and disposed of her body. The motion to reopen his post-conviction proceedings was denied. On appeal, this court treated the motion as a petition for error coram nobis relief and concluded that the petitioner was entitled to an evidentiary hearing. *State v. Ricky Harris*, No. E1999-02771-CCA-R28-PC (Tenn. Crim. App. Dec. 4, 2001) (order). Subsequently, a majority of our supreme court concluded that this court erred by treating the motion as a petition for error coram nobis relief, and the court affirmed the denial of the motion to reopen post-conviction proceedings. *See Harris*, 102 S.W.3d at 588.

On March 11, 2004, eleven months after the Tennessee Supreme Court's 2003 opinion was released, *Harris* filed a petition for error coram nobis relief, alleging the State withheld exculpatory evidence related to the alibi witness and to a letter received by the prosecution in 1991 from someone named Bill, who allegedly confessed to the killing. The letter was provided to counsel in 1991, but the petitioner argued he did not learn of its exculpatory nature until a handwriting expert reviewed it in 2002. Likewise, the petitioner claimed he did not know the exculpatory value of the alibi witness until his private investigator contacted the witness in 1998. The supreme court stated that even if it were to accept the petitioner's reasons for the delay in filing his coram nobis claim, the petitioner "could have asserted [the] claim as early as 1998 with regard to the alibi evidence and as early as June 2002 with regard to the . . . confession evidence." *Harris*, 301 S.W.3d at 146. The court noted the delays spanned six years and twenty-one months respectively and concluded that "[n]o statute in Tennessee nor tolling rule developed at common law provides that the time for filing a cause of action is tolled during the period in which a litigant pursues a related but independent cause of action." *Id*. The court stated that when the petitioner chose to file a motion to reopen his post-conviction proceedings in 1998, he, likewise, chose not to file a petition for coram nobis relief. *Id*. at 146-47. The court distinguished the petitioner's case

from the cases in which the limitations period had been tolled by noting that "the opportunity to assert a coram nobis claim was entirely within [the petitioner's] control after 1998 with regard to the alibi evidence and after . . . 2002 with regard to the . . . confession evidence." *Id*. at 147. The court concluded that "[n]othing prevented [the petitioner] from filing a separate coram nobis action while his motion to reopen was pending." *Id*. (citing *John Haws Burrell v. State*, No. E1999-02762-CCA-R3-PC, 2001 WL 15792, at *2 (Tenn. Crim. App. Jan. 8, 2001), *perm. app. denied* (Tenn. May 21, 2001)). The court concluded that "[t]he time within which [the petitioner] filed his petition . . . exceed[ed] the reasonable opportunity afforded by due process" under the circumstances of the case. *Id*.

In the present case, the record reflects that the Petitioner learned of the TBI reports, medical records, and photographs in 2000 during the federal habeas corpus proceedings. In light of *Harris*, we conclude that after that time, the opportunity to assert the Petitioner's coram nobis claim was entirely within his control. Although the Petitioner was concerned about whether filing a coram nobis petition in state court might result in forfeiture of his federal habeas corpus petition, our supreme court stated in 2010, that no statute or rule provides for the tolling of a limitations period while a petitioner pursues a related but independent cause of action. Once *Harris* was released, the Petitioner was on notice that the federal habeas proceeding did not toll the statute of limitations period for the state action. The Petitioner waited an additional three and one-half years to file his coram nobis claim.

We note that two years after the relevant evidence in the present case was discovered, *Palmer v. Carlton*, 276 F.3d 777 (6th Cir. 2002), addressed the Petitioner's concerns about the impact of filing a state action while federal habeas corpus proceedings are pending. Although the circuit court denied relief on unrelated grounds, it noted in *Palmer* that the United States Supreme Court suggested two procedural avenues in *Duncan v. Walker*, 533 U.S. 167, 182-83 (2001), to address situations in which a petitioner files a timely federal habeas corpus petition pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 that remains pending past the limitations period and is dismissed for failure to exhaust claims in state court. The first option included a stay in the federal proceedings until unexhausted state claims are resolved. *Palmer*, 276 F.3d at 780 (citing *Duncan*, 533 U.S. at 183). Alternatively, the district courts could "equitably toll the limitations period during the time that a . . . habeas petition is pending before a dismissal[.]" *Palmer*, 276 F.3d at 781 (citing *Duncan*, 533 U.S. at 183). Ultimately, the circuit court in *Palmer* concluded that a district court should grant a thirty-day stay in the federal proceedings to permit a petitioner to raise and exhaust claims in state court. *Id*.

The Petitioner cites *Rhines v. Weber*, 544 U.S. 269 (2005), to legitimize his fear of forfeiting the federal habeas corpus claim if he filed a state coram nobis petition. In *Rhines*, the petitioner filed a federal habeas corpus petition alleging various constitutional defects.

Several of the petitioner's claims had not been exhausted in the state court. As a result, the petitioner requested that the federal proceedings be stayed in order for the unexhausted claims to be presented in the state court in an effort to comply with the federal statute of limitations. The district court granted the request and held the proceedings in abeyance for sixty days. The United States Supreme Court concluded that the stay and abeyance procedure "should be available only in limited circumstances." *Id*. at 277. The Court further concluded that "[b]ecause granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Id*. The Court stated that "it likely would be an abuse of discretion for a district court to deny a stay and to dismiss . . . if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged intentionally dilatory litigation tactics." *Id.* at 278.

Unlike the petitioner in *Rhines* who initially submitted a petition with unexhausted claims, the Petitioner in the present case was unaware of the newly discovered evidence until the federal proceedings were well underway. As a result, the Petitioner was not at fault for not exhausting the issue in state court before the 2000 discovery. Under the standard delineated by the Supreme Court in *Rhines*, no evidence shows that a request for a stay and abeyance of the federal proceedings would have been denied under the circumstances. To the contrary, the standard suggests that a denial of a request for a stay and abeyance under the present circumstances would have been an abuse of discretion. *See id*. In any event, as a result of *Palmer* and *Rhines*, the Petitioner was on notice that he should have requested a stay and abeyance of the federal habeas proceedings and filed his state coram nobis petition. We find no authority to suggest the Petitioner's federal proceedings would have been prejudiced by following the procedure outlined in *Palmer* and *Rhines*. *Rhines* was released in May 2005, but the Petitioner chose not to file his coram nobis petition for another eight years. We note that even if *Palmer* and *Rhines* are not definitive of federal law, the Petitioner filed his coram nobis petition twenty-two months after the federal district court entered its order denying habeas corpus relief.

As a result, we conclude that the delay in seeking coram nobis relief was unreasonable under the circumstances of this case and that due process does not preclude application of the statute of limitations. The trial court properly found that due process did not require tolling the one-year statute of limitations and properly dismissed the petition.

In consideration of the foregoing and the record as a whole, the judgment of the coram nobis court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE